UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PENELOPE IFILL,

                    Plaintiff,

          -v-                                          No. 04 Civ. 5963 (LTS)(DFE)

UNITED PARCEL SERVICE,
WILLIAM SEWARD, BERNARD COLLINS,
AND MICHAEL IMONDI,

                    Defendants.

────────────────────────────────


MEMORANDUM OPINION AND ORDER


APPEARANCES:

SANDRA D. FRELIX, P.C.                  PROSKAUER ROSE LLP
  By: Sandra D. Frelix, Esq.              By: Aaron J. Schindel, Esq.
67 Wall Street, 22nd Floor              1585 Broadway
New York, NY 1005                       New York, NY 10036


*Attorney for Plaintiff*                *Attorneys for Defendants United Parcel
                                        Service, William Seward, Bernard Collins
                                        and Michael Imondi*




LAURA TAYLOR SWAIN, United States District Judge

Plaintiff Penelope Ifill ("Plaintiff" or "Ifill"), a black West Indian-American woman, brings this action against United Parcel Service ("UPS"), William Seward ("Seward"), Bernard Collins ("Collins"), and Michael Imondi ("Imondi") (collectively "Defendants"). She alleges that Defendants have engaged in discriminatory employment practices by reducing her stock award in 2002, demoting her without cause, subjecting her to harassing work conditions at both her former and current position and suspending her salary. Plaintiff brings claims of race, sex, and disability discrimination and retaliation, under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.,[1] Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and the New York City Human Rights Law ("NYCHRL"), N.Y. Charter & Admin. Code § 8-107.

The Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

Defendants move for summary judgment dismissing Plaintiff's complaint in its entirety. The Court has considered thoroughly all of the parties' submissions and arguments in connection with the motion. For the following reasons, Defendants' motion is granted in part and denied in part.

---

[1] The causes of action arising under Title VII and the ADA are brought only against Defendant UPS. (See Docket Entry No. 35.)

The following material facts are undisputed unless otherwise stated.[2] In 1989, Penelope Ifill began working at UPS as a part-time package handler in the midtown Manhattan office. (Pl.'s Rule 56.1 Stmt. ¶ 1.) After several promotions, she became a National Accounts Manager ("NAM") in 2000. (Id. ¶¶ 2-10; Def.'s Rule 56.1 Stmt. ¶ 24.) NAMs were responsible for managing large national accounts and handling business development of these accounts. (Def.'s Rule 56.1 Stmt. ¶ 7; Pl. Tr. 41:7-9.) Defendant William Seward became Ifill's direct supervisor in August 2001. (Def.'s Rule 56.1 Stmt. ¶ 26.)

Between September 2001 and August 2002, some clients who worked directly with Ifill or her support team expressed complaints to Seward about Ifill's quality of service. (Decl. of Seward Dated May 11, 2006 ("Seward Decl. I") Ex. A-G.) Defendants proffer e-mails sent to Plaintiff from Seward referencing these complaints and an e-mail complaint sent directly from one client to Plaintiff. (See id.). Plaintiff does not dispute the authenticity of these e-mails, but nonetheless avers she was unaware of any customer complaints. (Ifill Decl. ¶ 20.) Sometime in February 2002, there was a conversation between Seward and Ifill concerning reports that Ifill was allegedly conducting personal real estate business on company time. (Pl.'s Rule 56.1 Stmt. ¶¶ 12-13; Def's Rule 56.1 Stmt. ¶¶ 46-47.) Two days later, Seward asked her to write a statement memorializing their conversation. (Pl.'s Rule 56.1 Stmt. ¶ 13; Def's Rule 56.1 Stmt.

---

[2]    Plaintiff's Rule 56.1 statement fails to controvert any of the factual paragraphs in Defendants' Rule 56.1 statement. For this reason alone, the Court may deem <u>all</u> of the facts set forth in Defendants' Rule 56.1 statement to be admitted for purposes of summary judgment. <u>See</u> Local Civil Rule 56.1(c). The Court has nonetheless reviewed the entire evidentiary record, and this decision reflects consideration of both parties' evidentiary submissions, construed in the light most favorable to Plaintiff.

¶¶ 50-51; Seward Decl. I ¶ 12 and Ex. I.)  Ifill wrote that she was "unable to recollect or reconstruct our exchanges in their entirety."  (Seward Decl. I Ex. H.)  Ifill alleges that Seward "became enraged" with this statement and demanded that she write a new one.  (Pl.'s Rule 56.1 Stmt. ¶¶ 14-15.)  That night, Ifill called the UPS employee hotline ("UPS Hotline") to lodge a race and sex discrimination complaint against Seward.  (Def.'s Rule 56.1 Stmt. ¶ 54; Pl.'s Mem. at 5.)  In the same month, UPS' Business Conduct and Compliance Program investigated the matter and determined Seward had the right to ask Ifill for a report memorializing their conversation.  (Seward Decl. I Ex. I.)  The Compliance Department closed the matter but directed Seward to "be more sensitive towards [Ifill] in the future."  (Id.)

In or around April 2002, Plaintiff was injured in an auto accident and was placed on medical leave until October 14, 2002.  (Pl.'s Rule 56.1 Stmt. ¶ 17; Def.'s Rule 56.1 Stmt. ¶¶ 27, 56.)  Before Ifill returned to work, UPS' occupational health nurse informed Seward of Ifill's new physical restrictions and what work she could or could not do.  (Pl.'s Rule 56.1 Stmt. ¶ 17; Def.'s Rule 56.1 Stmt. ¶¶ 57-58.)  The occupational health nurse's report recommended that Ifill be confined to desk duty and noted that she could not perform a number of physical activities, including lifting objects, crouching or kneeling.  (Seward Decl. I Ex. J.)  The report did not say explicitly how many hours a day Ifill could work, and Seward assigned Ifill to a full day of desk duty upon her return.  (Pl.'s Rule 56.1 Stmt. ¶ 17; Def.'s Rule 56.1 Stmt. ¶ 58.)  After working two full days, Ifill went to her doctor and received a note recommending that her work hours be restricted to the hours between 8 a.m. and 12 p.m.  (Def.'s Rule 56.1 Stmt. ¶ 62; Frelix Decl. Ex. 2.)  Seward complied with this instruction.  (Id.; Deposition of Ifill, annexed to Decl. of Aaron J. Schindel, dated May 15, 2006, as Ex. A ("Ifill Dep.") 115:19-116:3.)

On November 27, 2002, in response to a company survey given to employees who had called the UPS Hotline, Ifill wrote a three-page memorandum ("Concern Memo") to UPS' Human Resources Department located at corporate headquarters in Atlanta, Georgia. (Pl.'s Rule 56.1 Stmt. ¶ 16; Def.'s Rule 56.1 Stmt. ¶ 63.) In the Concern Memo, Ifill wrote, in sum and substance, that she was still being discriminated against and harassed because she was a black, female employee. (Id.; Frelix Decl. Ex. 1; Schindel Decl. Ex. D.) She also requested a transfer to another position, but she was told there were no other lateral positions available at the time. (Def.'s Rule 56.1 Stmt. ¶ 63; Ifill Dep. 152:22-153:6.)

Certain UPS employees, including NAMs, are awarded units of stock under UPS' Management Incentive Plan. (Pl.'s Rule 56.1 Stmt. ¶ 18; Def.'s Rule 56.1 Stmt. ¶ 66.) On December 10, 2002, less than three weeks after writing the Concern Memo, Ifill was informed that she would be receiving only half of her year-end stock award under UPS' Management Incentive Plan, as determined by the management committee at UPS. (Pl.'s Rule 56.1 Stmt. ¶ 18; Def.'s Rule 56.1 Stmt. ¶ 66; Seward Dep. 168:10-12.) In or about December 2002, Seward told her that the reduction was due to customer complaints and poor performance. (Ifill Dep. 120:19-121:6; Seward Decl. I ¶ 16.) Plaintiff avers that it was well-established UPS policy to give notice of a stock award reduction by September of the year in which the stock award is granted, and Defendants do not proffer any evidence to the contrary. (Decl. of Ifill ¶ 22.) Plaintiff also testified that she received her stock award several weeks after other unspecified white, male NAM's received theirs, and in the course of that testimony appeared to indicate that these NAM's did not receive a reduced stock award. (Ifill Dep. 117:5-118:15.)

On or about March 2003, Seward and Ifill had a dispute over the appropriate size

of Ifill's cubicle.  (Pl.'s Rule 56.1 Stmt. ¶ 26; Def.'s Rule 56.1 Stmt. ¶ 68.)  Ifill had UPS

facilities workers increase her cubicle's size by six inches, shrinking fellow NAM Tonya Watts's

cubicle, without giving notice to either Seward or Watts beforehand.  (Pl.'s Rule 56.1 Stmt. ¶ 49;

Def.'s Rule 56.1 Stmt. ¶ 69-70.)  Ifill alleges that her cubicle had been reduced in size while she

was away on maternity leave,[3] and that she had only returned it to its original size.  (Ifill Dep.

99:22-25.)  Seward called Ifill into his office and characterized her behavior as "borderline

insubordination."  (Pl.'s Rule 56.1 Stmt. ¶ 26; Def.'s Rule 56.1 Stmt. ¶ 72; Seward Decl. I Ex.

K.)

In late March 2003, a client who worked directly with Ifill called Seward and Ifill

to voice complaints about Ifill's responsiveness to his business's needs.  (Def.'s Rule 56.1 Stmt.

¶¶ 79-80; Seward Decl. I Ex. L.)

In April 2003, Seward informed Ifill that she was to be demoted because of

unsatisfactory work performance and insubordination.  (Pl.'s Rule 56.1 Stmt. ¶ 26; Def.'s Rule

56.1 Stmt. ¶ 81.)  Ifill went to Defendant Bernie Collins, her HR representative, to discuss the

demotion.  Collins gave her four options: 1) accept the demotion voluntarily, 2) separate from the

company completely, 3) transfer to another group manager position with the same title and

salary, or 4) remain in her current position on a probationary basis.  (Def.'s Rule 56.1 Stmt. ¶ 83.)

Ifill agreed to none of these options and, on April 11, 2003, she was demoted to Retail Channel

Supervisor.  (Pl.'s Rule 56.1 Stmt. ¶ 27; Def.'s Rule 56.1 Stmt. ¶ 84.)  The new position had a

---

[3]  At Ifill's deposition, she testified that she was on maternity leave sometime
between the second quarter of 2001 and August of 2001 (Ifill Dep. 58:15-19), and
that she had not noticed the cubicle size discrepancy until March 2003.  (Id. 97:6-
23.)

lower salary, provided no opportunity to earn a commission, and had less demanding responsibilities.  (Pl.'s Rule 56.1 Stmt. ¶¶ 27, 34-37.)  Susan Bauerfind, a white female, took Ifill's former NAM position and reported to Seward.  (Pl.'s Rule 56.1 Stmt. ¶ 28.)  The record is not clear as to the precise role that Seward or Collins played with respect to the decision-making aspects of the demotion.

In her new position, Ifill reported to Defendant Michael Imondi.  (Def.'s Rule 56.1 Stmt. ¶ 85.)  Ifill alleges that Imondi singled her out and micromanaged her by forcing her to report her whereabouts at every second of the day, including when she used the bathroom or went to lunch.  (Ifill Dep. 204:15-205:10.)  Ifill also asserts, based solely on conversations with other employees, that no one else who reported to Imondi was micromanaged in this way.  (Ifill Dep. 195:25-196:21; 205:6-21.)  Of the four other employees who reported to Imondi, four were female, and three of the four were racial minorities.  (Ifill Dep. 215:11-216:15.)

A "year-end effectiveness report" shows that Ifill received a 91.6% year-end effectiveness rating for 2002 and ranked ninth out of the eleven NAMs who were then reporting to Seward.  (Decl. of Seward Dated July 28, 2006 ("Seward Decl. II") Ex. A; Aff. of Frelix Ex. 4.)  Jay Cotta ("Cotta"), a white male NAM who reported to Seward, had an 87.9% year-end effectiveness rating for 2002 and ranked eleventh out of eleven among NAMs.  (Id.)  In the first quarter of 2003, just prior to Ifill's demotion, Ifill improved her performance rating by one percentage point, but ranked eleventh out of eleven, while Cotta improved his performance rating by ten percentage points in the first quarter of 2003.  (Seward Decl. II Ex. B.)[4]  According to

_____

[4]    Evidence of the rankings was proffered by Defendants in their reply papers. Plaintiff did not dispute this evidence in her sur-reply.

Plaintiff's opposition brief, Cotta was not demoted. (Opp'n at 18.) No evidence is proffered in support of Plaintiff's assertion, though Defendants do not dispute this assertion in their Reply.

On February 5, 2004, Seward sent an interoffice memo to Lori Hart ("Hart"), a white female NAM who reported to Seward. (Frelix Decl. Ex. 5; Seward Decl. I Ex. N.) The memo noted Hart's performance problems, but she was not demoted. (Id.) Rather, she was placed on a "30/60/90 day" performance improvement plan in order to improve and meet UPS expectations.[5] This plan is characterized by Seward as a probationary plan, and Plaintiff does not refute this characterization. (Seward Decl. I ¶¶ 24-25.) The record is not clear as to the difference between the 30/60/90 day plan and the probationary plan offered to Ifill, but it is undisputed that Ifill was not placed on a formal 30/60/90 review plan before she was demoted. (Pl.'s Rule 56.1 Stmt. ¶ 43.)

Defendants proffer an interoffice memo from Steve Baxter ("Baxter"), who had reported to Seward. (Seward Decl. I Ex. M.) Baxter, a white male NAM, was demoted on or around January 8, 2002, and also had his stock award reduced (Dep. of Seward dated Jan. 26, 2006, annexed to Schindel Decl. as Ex. B ("Seward Dep.") 220:9-25), because his performance "did not meet acceptable levels, equal to the position of National Accounts Manager," (id.; Seward Decl. I Ex. M), and because a customer also lodged complaints against Baxter. (Seward Dep. 158:16-18.) Defendants also proffer that Janice Anderson ("Anderson"), a white female NAM reporting to Seward, who also had performance problems, was transferred to another

---

[5]     The 30/60/90 day plan is a review process used to gauge performance improvements over a period of several months. The plan consists of several processes and measurements which are used to help participants meet UPS performance standards. (Seward Decl. I Ex. N.)

department in 2004, though the record is not clear as to whether the transfer resulted in lower pay or status for Anderson.  (Id. 95:6-9.)

On May 27, 2003, Ifill filed a charge of discrimination with the EEOC.  (Pl.'s Rule 56.1 Stmt. ¶ 29.)  On or about February 2, 2004, Ifill went on disability leave, claiming a work-related stress disorder injury.  (Pl.'s Rule 56.1 Stmt. ¶ 30; Def.'s Rule 56.1 Stmt. ¶ 97.)  On February 16, 2004, her salary was suspended.  (Ifill Decl. ¶ 32.)  She has not returned to work.  (Def.'s Rule 56.1 Stmt. ¶ 98.)  On April 30, 2004, Ifill received a "Notice of Right to Sue" letter from the EEOC.  (Frelix Decl. Ex. 3.)

## DISCUSSION

Summary judgment will be granted in favor of the moving party if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party moving for summary judgment carries the burden of demonstrating that there is no genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  Material facts are ones that could potentially affect the outcome of the suit; factual disputes that are irrelevant or unnecessary will not be considered.  Id. at 248.  If the moving party can then show that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," it has carried its burden.  Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  If the moving party has satisfied its burden, the non-moving party must present evidence to show that there is a genuine material factual issue to counter the summary judgment motion.  Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002).  See also Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986) ("[T]he party opposing the motion for summary judgment bears the burden of responding only after the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact.") (citations omitted).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts" to defeat the motion.  Caldarola, 298 F.3d at 160.

Plaintiff's Complaint essentially asserts that Defendants violated her right to nondiscriminatory treatment in four ways.  She alleges that her stock award reduction, her eventual demotion, Imondi's aggressive supervision of her workplace conduct, and the salary suspension were the products of prohibited race, sex, and disability discrimination.  Plaintiff also alleges that these actions constituted retaliation for her complaints to the UPS Hotline and to corporate headquarters with respect to allegedly discriminatory practices at UPS.  Finally, she alleges that the harassment she endured from both of her supervisors, Seward and Imondi, created a hostile work environment.

Defendants seek summary judgment dismissing Plaintiff's claim in its entirety.  Disparate treatment and retaliation claims brought under Title VII, the ADA, and Section 1981 are analyzed under the three-step burden shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Heyman v. Queens Vill. Comm. For Mental Health for Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999) (applying burden-shifting analysis to ADA cases); Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996) (applying burden-shifting analysis to retaliation claims); Patterson v. County of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004) (same substantive standards apply for Title VII

and Section 1981).[6]

<u>*Racial and Sex Disparate Treatment Claims*</u>

Plaintiff must first establish a <u>prima</u> <u>facie</u> case of discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802. To establish a <u>prima</u> <u>facie</u> case of discrimination under Title VII, Plaintiff must come forward with evidence addressing four factors: 1) she belonged to a protected class, 2) she was qualified for the position, 3) she suffered an adverse employment action, and 4) there were circumstances giving rise to an inference of prohibited discrimination. <u>Id.</u>

Once a plaintiff has made out a <u>prima</u> <u>facie</u> case, the burden shifts to the employer to offer some legitimate, nondiscriminatory reason for its actions. <u>McDonnell</u>, 411 U.S. at 802. "This burden is one of production, not persuasion," <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000), and the Court's analysis at this stage can involve no credibility assessment of the evidence. <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509 (1993). At this stage, the employer does not need to prove by a preponderance of the evidence that the rationale

---

[6]     Plaintiff's discrimination claims under the NYSHRL and NYCHRL are subject to the same standard of proof as claims under Title VII. <u>See Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 565 n.1 (2d Cir. 2000); <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 n.1 (2d Cir. 2000). Unless otherwise stated, the Court will apply the federal standard to both NYSHRL and NYCHRL claims. <u>Selmanovic v. NYSE Group, Inc.</u>, No. 06 Civ. 3046 (DAB), 2007 WL 4563431, at 4 (S.D.N.Y. Dec. 21, 2007). Although the individual Defendants may not be sued under Title VII or the ADA, the Court will refer to "Defendants" in the plural when addressing their arguments, as UPS's arguments in the Title VII or ADA context are equally applicable to Plaintiff's discrimination and retaliation claims invoked under the other statutes as against all Defendants.

was not discriminatory, but must simply present a clear explanation for the action. Gibbs v. Consol. Edison Co. of N.Y., Inc., 714 F. Supp. 85, 89 (S.D.N.Y. 1989). Finally, if the employer meets this burden, the plaintiff is required to show that the stated reasons are pretexts for prohibited discrimination. Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000).

Here, it is undisputed that Plaintiff belonged to a protected class with respect to her race and sex, that she met the basic qualification requirements for her job, and that the stock award reduction and salary suspension were adverse employment actions. The parties do dispute, however, whether Plaintiff's demotion and Imondi's aggressive management of Plaintiff constitute adverse employment actions.

An adverse employment action is a "materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities." Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005). It is undisputed that the challenged demotion resulted in loss of salary, commission opportunities, title and diminution of responsibilities and thus was, standing alone, clearly sufficient to constitute the requisite adverse employment action. Defendants nonetheless contend that, as a matter of law, Plaintiff's demotion did not in fact constitute an adverse employment action because Plaintiff was given the option of a lateral transfer before she was demoted, and the lateral transfer offered would not itself have constituted an adverse employment action (hereinafter a "non-adverse lateral transfer"). However, at most, the case law cited by Defendants in support of this purported rule stands for the more narrow proposition that a demotion or termination is not adverse when the demotion/termination follows the employee's rejection of a non-adverse lateral transfer offer after the employee's original position has been eliminated. See Darnell v.

<u>Campbell County Fiscal Court</u>, No. 90-5453, 1991 WL 11255, *3 (6th Cir. Feb. 1, 1991) ("There is an important distinction between 'eliminating a position' and 'terminating employment.' An offer of a lateral transfer places the decision of continued employment completely at the discretion of the employee.").

In this case, the record is clear that Plaintiff's original position remained available after her demotion and that, after the non-adverse lateral transfer and other options were offered by Collins and rejected by Plaintiff, it was UPS[7]—not Plaintiff—that relegated Plaintiff to a position lower in pay and title. Moreover, while in the cases cited by Defendants the courts arguably relied in part on the fact that the plaintiff employees had been offered non-adverse lateral transfers prior to termination, <u>see, e.g.</u>, <u>McLeod v. N.Y. State Div. of Housing and Cmty. Renewal</u>, No. 91 Civ. 1086 (LAP), 1996 WL 131843, *7 (S.D.N.Y. March 25, 1994); <u>Spina v. Our Lady of Mercy Med. Ctr.</u>, No. 97 Civ. 4661 (RCC), 2003 WL 22434143, *4 (S.D.N.Y. Oct. 23, 2003), none of the decisions dismissed the Title VII causes of action on the basis that the termination in question did not constitute an adverse employment action. Therefore, Plaintiff's rejection of a non-adverse lateral transfer prior to her demotion does not render the <u>demotion itself</u>, which was undisputedly initiated entirely by one or more of the individual Defendants, non-adverse for purposes of meeting her <u>prima facie</u> burden.

Plaintiff has failed, however, to proffer any evidence that Imondi's micromanagement constituted an adverse employment action. Plaintiff's allegations that Imondi excessively monitored her attendance and required her to frequently provide explanations of

---

[7] As noted previously, it is unclear to what extent Seward or Collins participated in the decision to demote.

where she was create no triable issue whatsoever as to whether the concrete terms and conditions of her employment were materially altered by Imondi's behavior. <u>See</u> <u>Scafidi v. Baldwin Union Free School Dist.</u>, 295 F. Supp. 2d 235, 239 (E.D.N.Y. 2003) ("To qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable consequences."); <u>Castro v. New York City Bd. of Educ. Personnel</u>, No. 96 Civ. 6314 (MBM), 1998 WL 108004, *7 (S.D.N.Y. Mar. 12, 1998) ("although reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions"). Nor does Plaintiff proffer any evidence that Imondi's behavior deprived her of specific employment opportunities for growth or advancement. <u>See</u> <u>Campbell v. Grayline Air Shuttle, Inc.</u>, 930 F. Supp. 794, 802 (E.D.N.Y. 1996) ("A materially adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity") (quotations omitted). Therefore, Plaintiff's race and sex disparate treatment claims are dismissed to the extent that they are premised on Imondi's treatment of Plaintiff.

Finally, to establish an inference of discrimination in the <u>prima</u> <u>facie</u> case, Plaintiff has a "minimal" burden. <u>See</u> <u>McGuinness v. Lincoln Hall</u>, 263 F.3d 49, 53 (2d. Cir. 2001). Plaintiff need only show that she was replaced by someone outside her protected class or show that a similarly situated employee was treated differently than her. <u>Id.</u>; <u>see also</u> <u>Zimmerman v. Associates First Capital Corp.</u>, 251 F.3d 376, 381 (2d Cir. 2001). With respect to her demotion, it is undisputed that a white woman replaced her. It is also undisputed that Cotta, a white male NAM working under Seward, received lower performance ratings than Plaintiff at

least in 2002, and it is apparently undisputed that Cotta was not demoted.[8]  These similarities

between Plaintiff and Cotta are sufficient for purposes of satisfying Plaintiff's "minimal" burden

in meeting the fourth prong of her prima facie case with respect to her demotion.  See

McGuinness, 263 F.3d at 54 (fourth prong met where plaintiff shared similar rank and was

subject to same decision-maker as employee not in her protected classes).  She has also met the

fourth prong with respect to the stock award reduction, given her testimony that white male

NAM's did not receive stock award reductions.

Plaintiff has failed, however, to proffer any evidence whatsoever of circumstances

giving rise to an inference of discrimination based on sex or race with respect to the February

2004 salary suspension.  Plaintiffs do not proffer any evidence as to whether other employees'

salaries were suspended when they went on disability leave, nor is there any evidence of animus

on the basis of race of sex.  Defendants are therefore entitled to judgment as a matter of law on

Plaintiff's race and sex disparate treatment claims to the extent that they are premised on the

salary suspension.

Because Plaintiff has met her prima facie burden with respect to the stock award

reduction and her demotion, Defendants now bear the burden of proffering legitimate,

nondiscriminatory reasons to explain Plaintiff's stock award reduction and demotion.

Defendants point to numerous customer complaints lodged in 2002 and brought to the attention

of Plaintiff, Plaintiff's refusal to memorialize her conversation with Seward with respect to the

---

[8]        As noted in the Background section, Plaintiff actually does not proffer any
evidence that Cotta was not demoted, but merely asserts so in her opposition
papers.  Because Defendants do not contest this unsubstantiated assertion in their
Reply, the Court will assume for purposes of this motion practice that Cotta was
not demoted.

real estate dispute in 2002, the cubicle incident in March 2003 and one additional customer complaint lodged in March 2003 as the bases upon which the adverse employment actions were taken. These proffers satisfy Defendants' burden at this stage and, accordingly, the burden shifts back to Plaintiff to point to evidence in the record that could reasonably support a finding that Defendants' proffered legitimate, nondiscriminatory reasons for reducing Plaintiff's stock award and demoting her were mere pretexts for discrimination on the basis of race or sex.

In attempting to frame a genuine issue of fact with respect to pretext, Plaintiff compares the way she was treated with the way in which UPS and Seward dealt with Hart, the white female NAM, and Cotta, the white male NAM. However, Plaintiff fails to offer any evidence that these individuals were similarly situated to Plaintiff for purposes of rebutting Defendants' legitimate, nondiscriminatory reasons. No evidence of any customer complaints or any incidents giving rise to perceived insubordination is presented with respect to Cotta or Hart. Nor does Plaintiff proffer evidence that any other similarly-situated individuals who were not in Plaintiff's protected classes were treated differently.

Noting that Hart was placed on a formal 30/60/90 day plan, Plaintiff asserts that Defendants failed to do the same with Plaintiff. However, Plaintiff proffers no evidence whatsoever comparing Hart's formal 30/60/90 day plan, Defendants' characterization of which as "probationary" is not disputed by Plaintiff, with the term of probation that was undisputedly offered to, and subsequently rejected by, Plaintiff, and no rational fact-finder reviewing the Hart memo would be able to discern any material difference between Hart's 30/60/90 day plan and any other ordinary probation plan. Moreover, although Plaintiff argues in her opposition papers that UPS had a policy of regularly placing underperforming employees on a formal 30/60/90 day

plan, she proffers no evidence to substantiate that assertion. Therefore, even if Plaintiff had proffered evidence that Hart had demerits in her record similar to those of Plaintiff, which Plaintiff did not, there is no evidence that Hart was treated differently from Plaintiff, and no rational fact-finder could infer discriminatory pretext based on a comparison of the two employees.

With respect to Cotta, Plaintiff relies solely on the undisputed proffer that Plaintiff had a higher performance rating than Cotta in 2002 (ninth out of eleventh compared to eleventh out of eleventh), and that Cotta was not demoted and did not receive a stock award reduction. While this proffer was sufficient to meet Plaintiff's _prima facie_ burden, it does not frame any genuine issue of pretext in light of Defendants' proffers. Plaintiff proffers no evidence that performance ratings played, or ever played, a significant role in any decision to reduce a stock award or demote any UPS employee. In any case, no rational fact-finder could conclude, based on this slight advantage in performance rating, that Defendants' proffered reasons for reducing her stock award were pretext for prohibited discrimination, because there is no evidence, as discussed previously, that Cotta had any customer complaints or incidents of perceived insubordination in his record. In this regard and in addition to the reasons already discussed, there is also no genuine issue of pretext with respect to Plaintiff's demotion in 2003, because in the quarter prior to her demotion, Plaintiff only improved by less than one percentage point in her performance rating, falling to the bottom of the performance rating ranking system, while Cotta improved by ten percentage points in that same quarter. Under these circumstances, no rational fact finder could reasonably infer that UPS' stated reasons were pretexts for prohibited discrimination.

Plaintiff also attempts to rebut Defendants' proffers of legitimate, nondiscriminatory reasons by asserting that she was never spoken to about deficiencies in her work before the adverse actions were taken. Absent evidence that other similarly situated individuals outside Plaintiff's protected classes were told about similar deficiencies and given an opportunity to correct them, Plaintiff's assertion that she was not told about the complaints raises no genuine issue of material fact. In any case, faced with copies of e-mails proffered by Defendants, whose authenticity is not in dispute, which clearly indicate that customer complaints were sent to Plaintiff's e-mail account, and Plaintiff's bald assertion of ignorance, no rational fact-finder could conclude that Plaintiff was never aware of customer complaints. Morever, it is undisputed that Plaintiff was offered an opportunity to be placed on probation, in which case she was indisputedly given an opportunity to correct her deficiencies. Therefore, Plaintiff's notice argument presents no genuine issue of material fact.

Plaintiff's failure to proffer any evidence that would create a genuine issue as to pretext is even more apparent in light of Defendants' additional, uncontradicted proffers that Baxter, another white male NAM who worked under Seward, was also demoted and had his stock award reduced for customer complaints concerning delayed and/or inadequate follow up with customers, and that Anderson, a white female NAM who also worked under Seward and had "mediocre to substandard" performance problems, was transferred out of Seward's group in 2003 or 2004.[9]

For the above mentioned reasons, Plaintiff has failed to demonstrate that there is a

---

[9] Even if Anderson's transfer did not materially affect her pay or status, Plaintiff does not dispute that Plaintiff herself was offered a transfer out of Seward's group to a position of equal pay and status, which she rejected.

genuine issue of material fact with respect to whether Defendants' proffered legitimate,

nondiscriminatory reasons for demoting Plaintiff and reducing her stock award were merely a

pretext for discrimination on the basis of race or sex. Defendants' motion for summary judgment

is, therefore, granted with respect to Plaintiff's race and sex discrimination claims.


*Disability Discrimination Claim*

In order for Plaintiff to establish a prima facie case of discrimination under the

American with Disabilities Act (ADA), she must show that: 1) the employer is subject to the

ADA, 2) she was a person with a disability within the meaning of the ADA, 3) she was otherwise

qualified to perform the essential functions of her job with or without reasonable

accommodation, and 4) she suffered an adverse employment action because of her disability.

Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 149-50 (2d Cir. 1998).

Plaintiff has not framed a genuine issue of material fact as to whether she was

"disabled" within the meaning of the ADA. A person is disabled within the meaning of the ADA

if, inter alia, she has "a physical or mental impairment that substantially limits one or more of the

major life activities of such individual." 42 U.S.C. § 12102(2)(A). Plaintiff does not specify the

nature of her underlying impairment or the "major life activity" in which she claims she was

"substantially limited." Plaintiff's sole proffer with respect to her alleged disability, a doctor's

note concluding that she may only work four hours a day (Frelix Decl. Ex. 2), suggests an

argument that work is the major life activity in question. See Vaughnes v. United Parcels Serv.,

No. 97 Civ. 5849 (SHS), 2000 WL 1145400, at *5 (S.D.N.Y. Aug. 14, 2000) (holding that

"working" is a major life activity per se). "When the major life activity under consideration is

that of working, the statutory phrase 'substantially limits' requires . . . that plaintiffs allege they are unable to work in a broad class of jobs." <u>Toyota Motor MFG., Kentucky, Inc. v. Williams</u>, 534 U.S. 184, 200 (2002) (quoting <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471 (1999)).  The proffered doctor's note does not indicate that Plaintiff was in any way unable to perform the duties of a broad class of jobs or even those of her own position.  In addition, Plaintiff proffers no evidence to demonstrate how working part-time as a NAM "substantially limits" her ability to work generally.  The mere inability to perform work-related tasks at one's optimal level is insufficient to demonstrate "a substantial limitation" of a "major life activity."  <u>See</u> <u>Vaughnes</u>, 2000 WL 1145400, at *6 (holding that a mother with a limp who could not perform some tasks at home and had trouble walking was not disabled under the ADA because she was still able to perform these tasks at some level).  Therefore, Plaintiff's proffer does not create a genuine issue as to whether she has met the <u>prima facie</u> burden for her disability claim and summary judgment will therefore be granted in favor of Defendants on Plaintiff's ADA and NYCHRL disability claims.

The Court also grants summary judgment in favor of Defendants as to Plaintiff's NYSHRL disability claim.  NYSHRL defines disability as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques."  N.Y. Exec. Law § 292(21) (McKinney 1993).  Plaintiff proffers no evidence with respect to any "anatomical, physiological, genetic or neurological conditions" in connection with this claim, and therefore has failed to meet her burden of demonstrating that she is "disabled" within the meaning of the NYSHRL.

*Hostile Work Environment Claim*

In order to establish a Title VII claim predicated on the existence of a hostile work environment, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). The environment must be both subjectively and objectively hostile and abusive. Hayut v. State Univ. of N.Y., 352 F.3d 733, 745 (2d Cir. 2003). Isolated instances of harassment ordinarily do not rise to the necessary level; the employee must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted, to have altered the conditions of his or her working environment. Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d. Cir. 2000). The Supreme Court has set a demanding test in order to avoid construing Title VII as a "general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998). The Court analyzes hostile work environment claims by evaluating the totality of the circumstances to determine whether the conduct complained of was sufficiently severe or pervasive to meet the objective prong of this test. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 767 (2d Cir. 1998).

With respect to Seward's treatment of Plaintiff, Plaintiff's repeated, vague and conclusory allegations of Seward's "harassment" are insufficient to support a conclusion by a rational fact-finder that a hostile work environment existed. Nor could a rational fact-finder conclude that the single instance with respect to the real estate conversation, which was followed promptly by a meeting in which Seward was directed to be more sensitive, was so severe that the

conditions of Plaintiff's working environment were materially changed.  See, e.g., Matlosz v. J.P. Morgan Chase, No. 03 Civ. 6235 (JGK), 2005 WL 2242196, *9 (no hostile working environment as a matter of law, where single incident involving false accusations of sexual harassment was promptly addressed by senior management and ended in an apology to the plaintiff).

Nor is there any genuine issue of material fact with respect to whether Imondi created a hostile working environment for Plaintiff.  Plaintiff's sole evidentiary proffer as to whether Imondi allegedly mistreated her because of her sex or race is her assertion that other employees were not similarly micromanaged.  However, because Plaintiff bases her assertion on conversations with other employees, the assertion is inadmissible as it is based on hearsay. Moreover, even if it were undisputed that she was the only employee reporting to Imondi who was subjected to Imondi's excessive monitoring practices, this assertion actually undermines Plaintiff's claim that she was mistreated because of her sex or race—of the four other employees who worked under the supervision of Imondi, it is undisputed that all were females and three were racial minorities.  Because Plaintiff proffers no other evidence that Imondi's treatment of her was because of her sex or race, there is no genuine issue of material fact in connection with her hostile work environment claim premised on Imondi's treatment.  See Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) ("it is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex.").

For these reasons, Plaintiff has not framed any genuine issue of material fact in connection with her hostile work environment claim, and Defendants' motion for summary judgment is granted with respect to that claim.

*Retaliation*

Plaintiff alleges that Defendants retaliated against her for filing grievances concerning race and sex discrimination within the UPS system by reducing the stock award and demoting her, through Imondi's aggressive micromanagement after she was demoted, and the February 2004 salary suspension. In order to establish a prima facie case for retaliation under Title VII, Plaintiff must satisfy four elements: 1) she engaged in a protected activity, 2) Defendants knew of the protected activity, 3) Defendants took adverse action against Plaintiff, and 4) a causal connection existed between the protected activity and the adverse employment action. Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006). Here, it is undisputed that Plaintiff's complaints to the 1-800 hotline and UPS Corporate Human Resources Department were protected activities under Title VII, and that Defendants knew of Plaintiff's protected activities.

To satisfy the third prong, Plaintiff must demonstrate that the retaliatory or discriminatory acts complained of are reasonably likely to deter a person from engaging in protected activity. Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). It is clear that the possibility of demotion, a stock award decrease and a salary suspension are likely to deter a person from engaging in protected activity. With respect to Imondi's treatment of Plaintiff, the Court cannot determine as a matter of law whether Imondi's behavior satisfies the third prong of Plaintiff's prima facie case without additional evidence concerning the nature of Imondi's treatment of Plaintiff, but the Court assumes for purposes of this motion practice that the third prong has been met.

To satisfy the fourth prong, Plaintiff can establish a causal connection between the

protected activity and the adverse employment action in two ways: 1) indirectly through a) evidence showing that the protected activity was followed closely in time by discriminatory treatment, or b) disparate treatment of fellow employees who engaged in similar conduct, or 2) directly through evidence of retaliatory animus directed against Plaintiff by Defendants. <u>DeCintio v. Westchester County Med. Ctr.</u>, 821 F.2d 111, 115 (2d Cir. 1987). Within a month of Plaintiff's submission of her Concern Memo to UPS' Human Resource Department in Atlanta, she was notified that her stock award would be cut in half. This time interval is sufficiently proximate to satisfy the fourth prong and meet her <u>prima facie</u> burden. <u>See</u> <u>Hernandez v. Kellwood Co.</u>, No. 99 Civ. 10015 (LTS), 2003 WL 22309326, *20 (S.D.N.Y. Oct.8, 2003) (finding that a time period of less than six months between Plaintiff's filing of EEOC charge and her firing was a sufficiently close gap to establish the fourth prong of the <u>prima facie</u> case). Plaintiff's demotion five months later, as well as Imondi's subsequent behavior towards her, are also sufficiently proximate in time to satisfy the fourth prong.

The salary suspension of February 2004, however, occurred over fourteen months after the latest protected activity. Although "there is no bright-line rule which identifies the point at which temporal proximity between [protected activity] and the employer's alleged adverse employment action becomes too attenuated, on summary judgment, to sustain a charge of retaliation," <u>Caruso v. Camilleri</u>, No. 04-CV-167A, 2008 WL 170321, *27 (W.D.N.Y. Jan. 15, 2008) (quoting <u>Gormon-Bakos v. Cornell Coop. Extension of Schenectady Cty</u>, 252 F.3d 545, 554-55 (2d Cir. 2001)), the Court follows the course set by other courts that have determined that the passage of similarly lengthy or even shorter periods of time precluded the plaintiff from satisfying the fourth prong of the <u>prima facie</u> test on summary judgment. <u>See</u> <u>Gormon-Bakos</u>,

252 F.3d at 555 (citing cases); <u>Castro v. Local 1199</u>, 964 F. Supp. 719, 729 (S.D.N.Y. 1997)

("Courts have found that a lapse in time of this magnitude [one year] is insufficient to establish a

causal connection"). Plaintiff also proffers no evidence concerning other employees whose

salaries were suspended or any evidence of retaliatory intent. For these reasons, Plaintiff has

failed to meet her <u>prima facie</u> burden for her claim that the salary suspension constituted

retaliation for her protected activities, and that claim is accordingly dismissed.

With respect to Plaintiff's demotion and reduced stock award, Defendants satisfy

their burden of proffering legitimate, nondiscriminatory reasons. As already discussed,

Defendants proffer evidence demonstrating Plaintiff's communication deficiencies with her

customers and her insubordinate behavior. A rational fact-finder could also infer, based on the

Plaintiff's deposition testimony proffered by Defendants, that Imondi's management style

towards Plaintiff was also because of Plaintiff's past problems with performance and her history

of insubordination. Therefore, the burden shifts back to Plaintiff to proffer some showing that

these reasons were merely a pretext for retaliation.

With respect to the demotion and Imondi's treatment of her, the Court finds that

there is no genuine issue as to whether Defendants' legitimate, nondiscriminatory reasons for

these actions were merely pretexts for targeting her for the grievances lodged in February and

November 2002. There is no proffer of any evidence, direct or circumstantial, that any defendant

sought to punish Plaintiff for filing her grievances or deter her from doing so in the future, and

there is no proffer explaining how the March 2003 customer complaint and perceived

insubordination incidents, which were followed almost immediately by the April 2003 demotion,

were merely pretext for protected activities occurring several months earlier. <u>See</u> <u>Kautz v. Met-</u>

Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (on summary judgment, plaintiff must put forward "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder <u>could</u> rationally find them unworthy of credence") (citation omitted).  No rational fact-finder could conclude, based solely on the fact that Plaintiff was demoted to a position in which she was micromanaged by Imondi five months after her November 2002 complaint, especially given that customer complaints and insubordination occurred <u>after</u> November 2002 and just prior to her demotion, that her April 2003 demotion and Imondi's subsequent micromanagement were based on her protected activities.  <u>See</u> <u>Bell v. Rochester Gas & Elec. Corp.</u>, --- F. Supp. 2d ---, 2008 WL 803652, *10 (W.D.N.Y. Mar. 26, 2008) (although the "temporal proximity of these events [protected activity and termination] may be found to create an inference of retaliation for the purposes of [plaintiff's] <u>prima facie</u> case, without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext") (quoting <u>Simpson v. N.Y. State Dep't of Civil Servs.</u>, No. 05-1492-CV, 2006 WL 93011, *2 (2d Cir. Jan. 9, 2006)); <u>Thomas v. S.E.A.L. Sec., Inc.</u>, No. 04 Civ. 10248 (JSR)(GWG), 2007 WL 2446264, *14 (S.D.N.Y. Aug. 30, 2007) (same) (citing <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 770 (2d Cir. 1998) (strong temporal connection and other circumstantial evidence sufficient to create genuine issue of pretext)), <u>adopted by</u> 2007 WL 2844955 (S.D.N.Y. Sept. 28, 2007); <u>Skrjanc v. Great Lakes Power Serv. Co.</u>, 272 F.3d 309, 317 (6th Cir. 2001) ("temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual").  Therefore, Plaintiffs' claims of retaliation based on her demotion and Imondi's treatment of her are dismissed.

The Court nonetheless holds that a triable issue exists as to Plaintiff's claim of retaliation with respect to the stock award reduction. In addition to the fact that it occurred mere weeks after Plaintiff's follow-up complaint in November 2002, Plaintiff avers that it was UPS' policy to notify employees of any stock award reductions in September of the year in which the award would be issued. Defendants proffer nothing to contradict this averment. Defendants' proffered reasons for the stock award reduction, the customer complaints and insubordinate behavior that took place in 2002, undisputedly occurred before August, yet Plaintiff was not notified that she would receive a stock award reduction in September, pursuant to a UPS policy whose existence is in dispute. Rather, the stock award reduction was announced in December, contrary to allegedly customary practice, soon after Plaintiff had lodged the follow-up complaint in November. Given the particular timing of these events, and Plaintiff's uncontradicted averment that Defendants violated established UPS policy with respect to notification, and viewing this evidence in the light most favorable to Plaintiff, the Court finds that a genuine issue of material fact exist with respect to whether the stock award reduction was based at least in part on Plaintiff's protected activity.[10]

---

[10]    Plaintiff's case for pretext is arguably weakened by her own averment that "Defendants waited three months after the latest permissible notification date to inform me of my stock award reduction" (Ifill Decl. ¶ 23), which would mean that Defendants had decided to reduce her stock award before her November 2002 follow-up grievance, and that the retaliatory harm complained-of is not the stock award reduction itself, but Plaintiff's induced reliance from September to December on the assumption that her stock award would not be reduced. Plaintiff's averment, however, is speculative and she provides no foundation for her knowledge that Defendants waited three months. In any case, and also because of temporal proximity and the uncontradicted averment that UPS violated its own notification policy, even if her averment were admissible, there would still be a genuine issue of material fact with respect to retaliation, albeit of a less severe nature, for her February 2002 complaint.

Therefore, Defendants' motion for summary judgment is granted as to Plaintiff's claim of retaliation based on her demotion and Imondi's behavior, and denied with respect to Plaintiff's claim of retaliation based on the stock award reduction.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Plaintiff's race, sex, and disability discrimination claims, Plaintiff's hostile work environment claims, and Plaintiff's retaliation claims with respect to her demotion and Imondi's behavior. Defendants' motion is denied as to Plaintiff's retaliation claim concerning her stock award reduction.

The Clerk of Court is respectfully requested to terminate Docket Entry No. 56. The parties shall meet promptly with Magistrate Judge Eaton to discuss settlement and any other pre-trial activities that may be necessary for the resolution of Plaintiff's remaining claim.

SO ORDERED.

Dated:     New York, New York
           July 17, 2008

                                        LAURA TAYLOR SWAIN
                                        United States District Judge